# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 38771 (f rev)**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Cory D. PHILLIPS**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Upon further review and on remand from
the United States Court of Appeals for the Armed Forces

Decided 8 March 2019

————————————

*Military Judge:* Shelly W. Schools.

*Approved sentence:* Bad-conduct discharge, confinement for 1 year, and reduction to E-1. Sentence adjudged 6 November 2014 by GCM convened at Peterson Air Force Base, Colorado.

*For Appellant:* Major Annie W. Morgan, USAF.

*For Appellee:* Lieutenant Colonel Joseph Kubler, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Lieutenant Colonel Roberto Ramirez, USAF; Major Jeremy D. Gehman, USAF; Major Amanda L.K. Linares, USAF; Major J. Ronald Steelman, III, USAF; Captain Sean J. Sullivan, USAF; Gerald R. Bruce, Esquire; Mary Ellen Payne, Esquire.

Before MAYBERRY, HUYGEN, and POSCH, *Appellate Military Judges*.

Chief Judge MAYBERRY delivered the opinion of the court, in which Senior Judge HUYGEN and Judge POSCH joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

MAYBERRY, Chief Judge:

## I. BACKGROUND

Appellant's case is before us for the third time. Contrary to his pleas, Appellant was convicted by a military judge sitting alone of aggravated sexual assault against Senior Airman (SrA) LS and abusive sexual contact against Airman First Class (A1C) KW, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] Appellant was sentenced to a bad-conduct discharge, confinement for one year, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

The offenses arose from Appellant's relationships with SrA LS and A1C KW at Peterson Air Force Base, Colorado. Appellant and the two Airmen were assigned to the same squadron and Appellant had regular on-duty contact with both. Appellant had a short-lived romantic relationship with SrA LS, including consensual sexual activity that ceased approximately one week before the incident that gave rise to his conviction of aggravated sexual assault. The underlying facts of each incident included sexual activity after the consumption of alcohol by Appellant and each victim.

In Appellant's initial appeal to this court, Appellant asserted that his convictions for both specifications were legally and factually insufficient and then later filed a supplemental assignment of error alleging that the military judge erred when she considered charged offenses as propensity evidence in light of *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016).[2] This court found the convictions legally and factually sufficient, found the military judge erred in considering the charged offenses for propensity, and, applying Article 59(a), UCMJ, 10 U.S.C. § 859(a), held the error was nonconstitutional in nature and harmless and thus did not materially prejudice Appellant's substantial rights. *See United States v. Phillips* (*Phillips I*), No. ACM 38771, 2016 CCA LEXIS 532 (A.F. Ct. Crim. App. 7 Sep. 2016) (unpub. op.). Recognizing the potential applicability of *Hills*, the court also analyzed the error as consti-

---

[1] Because the aggravated sexual assault occurred in early June 2012, the conviction was based on the version of Article 120, UCMJ, in effect for offenses occurring between 1 October 2007 and 28 June 2012. 10 U.S.C. § 920(c) (2006), *as amended by*, the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109–163, § 552, 119 Stat. 3136, 3257 (2006). Appellant was acquitted of an additional specification of abusive sexual contact involving SrA LS.

[2] Additionally, we specified two issues regarding post-trial processing, both of which became moot as a result of later proceedings.

tutional in nature and under the standard of harmless beyond a reasonable doubt. *Id.* at \*19–20. In light of the testimony of the two victims under oath, Appellant's pretrial admissions, other witness testimony that corroborated the victims' testimony and directly contradicted the version of events in Appellant's trial testimony, and the overall strength of the Government's case, the court found that the military judge's error was harmless beyond a reasonable doubt. *See id.* Finding no error materially prejudiced a substantial right of Appellant, we affirmed the findings and sentence. *Id.* at \*2.

The United States Court of Appeals for the Armed Forces (CAAF) granted review[3] and, on further consideration, set aside our prior decision and remanded the case to us for a new review under Article 66, UCMJ, 10 U.S.C. § 866, in light of *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017). *See United States v. Phillips* (*Phillips II*), 76 M.J. 441 (C.A.A.F. 2017) (mem.).

In Appellant's initial appeal, this court also *sua sponte* assessed the failure of the addendum to the staff judge advocate's recommendation to correct an erroneous statement in the defense clemency submission in light of *United States v. Addison*, 75 M.J. 405 (C.A.A.F. 2016) (mem.), finding the errors did not warrant additional post-trial processing. On 6 February 2018, we set aside the action of the convening authority and returned the record of trial to The Judge Advocate General for remand to the convening authority for new post-trial processing and conflict-free defense counsel in light of *United States v. Addison*, 75 M.J. 405 (C.A.A.F. 2016) (mem.). *United States v. Phillips*

---

[3] The CAAF granted review of the following issues:

> I. WHETHER THE MILITARY JUDGE ABUSED HER DISCRETION BY GRANTING THE GOVERNMENT MOTION TO USE EVIDENCE OF CHARGED SEXUAL MISCONDUCT UNDER MIL. R. EVID. 413 TO SHOW PROPENSITY TO COMMIT OTHER CHARGED SEXUAL MISCONDUCT. *See UNITED STATES v. HILLS,* 75 M.J. 350 (C.A.A.F. 2016).

> II. WHETHER THE LOWER COURT ERRED WHEN IT FAILED TO REMAND APPELLANT'S CASE FOR NEW POST-TRIAL PROCESSING AFTER THE STAFF JUDGE ADVOCATE'S RECOMMENDATION (SJAR) FAILED TO CORRECT AN ERROR IN APPELLANT'S CLEMENCY SUBMISSION. *See UNITED STATES v. ADDISON*, [75 M.J. 405 (C.A.A.F. 2016)] (rem.).

> III. WHETHER APPELLANT'S CONVICTION ON SPECIFICATION 1 OF THE CHARGE IS LEGALLY INSUFFICIENT WHERE THE GOVERNMENT FAILED TO PROVE THAT APPELLANT AND SrA LS ENGAGED IN A SEXUAL ACT.

*United States v. Phillips*, 76 M.J. 57 (C.A.A.F. 2017).

(*Phillips III*), No. ACM 38771 (rem), 2018 CCA LEXIS 614 (A.F. Ct. Crim. App. 6 Feb. 2018) (unpub. op.). On 28 August 2018, the convening authority took action, again approving the adjudged sentence. On 7 September 2018, the case was again docketed with this court. Appellant submitted an additional—whether the unreasonable post-trial processing violated Appellant's due process rights—and requested we set aside the convictions. Having now reviewed Appellant's case for legal and factual sufficiency and in light of *Hukill*, we find no prejudicial error and affirm.[4]

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant argues the evidence produced at trial was factually and legally insufficient to support his conviction for aggravated sexual assault of SrA LS. Appellant specifically focuses on the Prosecution's failure to prove beyond a reasonable doubt that Appellant engaged in sexual intercourse with SrA LS as alleged. In so arguing, Appellant points to SrA LS's inability to recall any factors leading her to believe Appellant engaged in sexual intercourse with her on the evening in question.

Appellant also challenges the legal and factual sufficiency of his conviction for abusive sexual contact of A1C KW. Appellant primarily argues the evidence produced at trial fails to establish A1C KW was incapable of consenting to Appellant's actions because of her impairment from consuming alcohol on the evening in question. In support of this argument, Appellant points to the testimony of A1C KW that she believed she was not sufficiently impaired from alcohol when she awoke to Appellant touching her chest and vaginal area.

#### 1. Law

We review issues of legal and factual sufficiency de novo. Article 66, UCMJ, 10 U.S.C. § 866; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfind-

---

[4] In light of the new post-trial processing, we need not address the post-trial processing discrepancies that were discussed in *Phillips I. See Phillips I*, unpub. op. at *20–24.

er could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *Turner*, 25 M.J. at 324). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325; *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *Turner*, 25 M.J. at 325). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *Id.* (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)). Although we "cannot find as fact any allegations of which the [appellant] was found not guilty at trial," we "may consider facts underlying an acquitted charge in considering whether the facts support a separate charge." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).

To sustain a conviction for aggravated sexual assault, the Prosecution was required to prove: (1) that Appellant engaged in a sexual act with SrA LS by penetrating her vulva with his penis and (2) that he did so when SrA LS was substantially incapable of communicating her unwillingness to engage in the sexual act. *See Manual for Courts-Martial, United States* (2012 ed.) (*MCM*), App. 28, at A28–6, ¶ 45.b.(3)(c).

To sustain a conviction for abusive sexual contact, the Prosecution was required to prove: (1) that Appellant committed sexual contact upon A1C KW by touching through her clothing her genitalia and breast and directly touching her breast; (2) that he did so when A1C KW was incapable of consenting to the sexual contact due to impairment by alcohol and that condition was known or reasonably should have been known by him; and (3) that he did so

with the intent to arouse or gratify his sexual desire. *See* 2016 *MCM,* pt. IV, ¶ 45.b.(7)(f).[5]

### 2. Facts Regarding Aggravated Sexual Assault of SrA LS

Appellant and SrA LS had previously been involved in a romantic relationship, but SrA LS decided about one week before the charged incident that they should forgo the romantic aspects of their relationship and just remain friends. SrA LS testified that in June 2012 she had been out drinking with some friends and, although intoxicated, was in possession of her mental faculties when she returned to a friend's on-base house where Appellant had been socializing. After continuing to drink at this friend's house, SrA LS returned to her dormitory room with Appellant. SrA LS remembered eating some food before lying down on her bed to go to sleep. Appellant was sitting in a chair at this time. SrA LS awoke to find Appellant trying to put her underwear back on her by attempting to guide both of SrA LS's legs through one hole of the underwear. SrA LS pushed Appellant off of her, which resulted in his immediate departure from her room. SrA LS got out of bed to make sure her door was shut behind Appellant and then fell back asleep.

The next day, Appellant texted SrA LS to talk about what happened the previous evening. Later that day, the two met in SrA LS's room. SrA LS had no memory of engaging in any sexual activity with Appellant but still felt she had somehow been sexually violated by him. SrA LS also had no physical symptoms such as vaginal discomfort or discharge to confirm her suspicions that Appellant had engaged in sexual activity with her. Although Appellant did not admit to engaging in any sexual activity, he became very emotional and provided a general apology for his conduct. At trial, another Airman testified that he had spoken with both SrA LS and Appellant about an incident. Appellant told him SrA LS passed out and woke up when Appellant was putting her clothes back on her. SrA LS did not report the sexual assault. A mutual friend of both SrA LS and Appellant reported the incident involving Appellant and SrA LS to the Air Force Office of Special Investigations (AFOSI).

During the course of the AFOSI investigation, SrA LS agreed to call Appellant and allow an AFOSI agent to listen. During the course of that phone

---

[5] At the time of Appellant's contact offense in 2013, the President had not yet addressed the elements of sexual offenses under Article 120, UCMJ, in part IV of the Manual for Courts-Martial. Although the President did not articulate the elements until the 2016 *MCM*, those elements are applicable to Appellant's offense of abusive sexual contact under Article 120(d), UCMJ. *See United States v. Armstrong*, 77 M.J. 465, 467 n.1 (C.A.A.F. 2018).

call, Appellant claimed they were going to have sex that night before SrA LS passed out, but they did not. He also stated that he took off her pants and kissed her while she was passed out. Approximately one week after that pre-text phone call, SrA LS agreed to have a conversation with Appellant while wearing a recording device. The recording was offered into evidence with no objection from the Defense. During the recorded conversation, Appellant initially informed SrA LS that he was unsure whether they had sexual intercourse. Later, in response to SrA LS's direct question of whether they in fact had sex, Appellant responded with "I think so. Yeah." Appellant also stated that they "started to hook up" and, at some point during their physical interaction, he noticed that SrA LS was unresponsive or asleep. Appellant then attempted to put SrA LS's clothes back on her and immediately left the room. Appellant also informed SrA LS that he would not have stripped her naked and had sexual intercourse with her had she not been responsive initially.

At trial, Appellant took the stand in his defense and provided a somewhat different, and more detailed, version of the events with SrA LS that evening. Appellant testified that, after returning to SrA LS's dorm room, they eventually climbed into her bed and started kissing and touching each other. At some point, SrA LS's underwear was removed. Appellant then left the room to retrieve a condom from his room on the same dormitory floor. When he returned, Appellant found SrA LS asleep. As he felt it was not appropriate to leave SrA LS wearing no underwear, Appellant attempted to put her underwear back on her. Afterwards, Appellant left the room and went to sleep.

Appellant further testified that he reached out to SrA LS the next morning "asking [her] what happened, kind of referring to . . . [she] fell asleep" and asked if they could talk about it "because I knew it was probably bugging her that -- what -- what happened." Appellant corroborated SrA LS's testimony that he cried during their conversation the following day "because I felt that our friendship was over at that point . . . because of how she was yelling at me and how she responded."

On cross-examination, Appellant acknowledged the word "sex" as it was used in his recorded conversation with SrA LS meant sexual intercourse. Appellant was unable to explain how he was able to put SrA LS's underwear back on her given her unresponsive state and prone position in her bed. Appellant also had difficulty explaining why he lied to SrA LS about engaging in sexual intercourse.

### 3. Analysis of Aggravated Sexual Assault of SrA LS

Appellant's denial at trial of engaging in sexual intercourse with SrA LS was far less credible than his admissions during the recorded conversation. Appellant, at his trial by court-martial, now possessed the obvious motivation

to avoid a criminal conviction and the corresponding punishment. As a result, his now crystal clear memory of his actions on the evening in question was suspect. Appellant also had trouble during cross-examination explaining why he lied to SrA LS during the recorded conversation about engaging in sexual intercourse when the truth as he relayed it at trial could have put her mind at ease by assuring her she was not sexually violated that evening.

Appellant's testimony was also rebutted by other evidence admitted at trial. For example, Appellant suggested at trial that SrA LS never awoke while he was trying to put her underwear back on her. This suggestion, however, was rebutted by not only SrA LS's testimony but also by the pretrial admission Appellant made to the same friend who reported the incident to AFOSI. Appellant's trial testimony was also suspect regarding his inability to explain how he was able to put SrA LS's underwear back on her.

Based on Appellant's more credible admissions during the recorded conversation with SrA LS, there was sufficient evidence, when viewed in the light most favorable to the prosecution, for the military judge to find that Appellant penetrated SrA LS's vulva with his penis and that he did so when SrA LS was substantially incapable of communicating her unwillingness to engage in the sexual act. Furthermore, after making allowances for not personally observing the witnesses, we conclude beyond a reasonable doubt, based upon our independent review of the record, that Appellant is guilty of the charged offense.

**4. Facts Regarding Abusive Sexual Contact of A1C KW**

In November 2013, both Appellant and A1C KW were invited to have drinks with friends from work. Appellant arrived at the off-base bar shortly after A1C KW. Although Appellant and A1C KW worked together, they had only seen each other socially one other time when they both attended a movie with a group of mutual friends from their squadron. At some point after arriving at the bar, Appellant informed a co-worker he wanted to get to know A1C KW better. After consuming three drinks at the first bar, A1C KW and her group of friends, including Appellant, went to two other bars where they drank and danced. A1C KW became progressively more intoxicated as the evening continued, eventually requiring assistance to maintain her balance. A1C KW was also unable to keep her eyes open and her speech was impaired. At some point during the evening, Appellant had to hold A1C KW to keep her from falling down due to her level of intoxication.

As Appellant had moved from the on-base dormitories to an off-base apartment, prior to the bar closing A1C KW and another co-worker, SrA JY, decided they would sleep at Appellant's apartment instead of trying to get back to their dormitory on base. SrA JY wanted something to eat, so they

went to a fast-food restaurant. A1C KW was described by SrA JY as "very drunk" at this time and required physical assistance from both Appellant and SrA JY as they walked to the restaurant. A1C KW did not eat anything but did consume some water at the restaurant. Appellant, A1C KW, and SrA JY then took a taxi cab to Appellant's apartment, arriving around 0230 hours. A1C KW did not remember the walk from the cab to Appellant's third floor apartment. SrA JY testified A1C KW was "non-responsive" shortly after arriving at Appellant's apartment, meaning A1C KW was "blacked out" or "unconscious." Appellant and SrA JY carried A1C KW to Appellant's bedroom and placed her in his bed. Appellant and SrA JY planned to sleep in Appellant's living room. During the course of the evening, however, Appellant at least twice entered his bedroom to "check on" A1C KW.

Approximately 90 minutes after arriving at the apartment, A1C KW woke up to Appellant touching her breast and vaginal area over her clothes as well as directly touching her breast with his hand. Appellant eventually rolled A1C KW on top of him. A1C KW then kissed Appellant thinking he was her fiancé. Once she realized it was Appellant who was in bed with her, A1C KW rolled away from Appellant. Appellant tried to get A1C KW to acknowledge him but eventually left the room after she ignored him for a period of time.

A few days later, Appellant engaged in text communications with A1C KW in which he admitted that while he never "went under [A1C KW's] pants," he may have touched her bra that evening. Appellant also admitted to a co-worker that he kissed A1C KW and touched her breast.

Appellant testified at trial and denied initiating any physical contact with A1C KW. He stated A1C KW initiated the entire encounter by climbing on top of him and kissing him. Moreover, because A1C KW "grossed [him] out," Appellant testified he left the room to get away from her advances. Additionally, Appellant testified that he did not believe A1C KW was drunk at any point during the evening as she was able to walk and stand on her own.

### 5. Analysis of Abusive Sexual Contact of A1C KW

We find the evidence sufficient to prove Appellant committed abusive sexual contact. A1C KW's testimony alone was more than enough to support the sexual contact element. In this case, however, her testimony was corroborated by Appellant during the pretext conversation in which he admitted that, while he never "went under [A1C KW's] pants," he may have touched her bra that evening. Appellant also admitted to a co-worker that he kissed A1C KW and touched her breast.

Furthermore, contrary to Appellant's claims, the evidence produced at trial is sufficient to establish A1C KW did not have the mental capacity to consent to sexual activity because of her impairment by alcohol. *See generally*

*United States v. Pease*, 75 M.J. 180, 184–85 (C.A.A.F. 2016) (discussing our sister service court's definition of the term "incapable of consenting"). Multiple witnesses testified A1C KW became significantly intoxicated as the evening progressed. In fact, approximately 90 minutes before the incident, A1C KW was completely non-responsive, requiring Appellant and SrA JY to carry her to Appellant's bed.

Appellant's focus on A1C KW's personal assessment of the impact of alcohol on her mental capacity ignores her testimony that she was confused after arriving at Appellant's apartment and was clearly not aware of Appellant's presence in bed until he began touching her. Appellant's argument also fails to consider SrA JY's testimony that one of the times when Appellant checked on A1C KW he found her sitting up in bed in a "dazed" and "disoriented" state, unable to initially answer questions posed by him. While A1C KW did not link her disorientation to her consumption of alcohol, it was entirely reasonable for the factfinder to draw this conclusion given her need for assistance 90 minutes before Appellant's assault.

Appellant's testimony is far from credible when compared against the entirety of the evidence admitted at trial. His self-serving statements about A1C KW's aggression towards him did not match his description of his physical contact with her as documented in the pretext conversation. Likewise, his testimony that he had no interest in A1C KW's sexual advances stood in stark conflict with his statement earlier in the evening that he wanted to get to know A1C KW better.

Additionally, Appellant's hedged statement about A1C KW's level of intoxication was directly rebutted by three witnesses—all friends of Appellant––who noted A1C KW became very intoxicated as the evening progressed. More damaging, however, was Appellant's admission during the pretext conversation that the group eventually stopped A1C KW from drinking as she had clearly had enough alcohol for the evening. In light of the entirety of the evidence, it was not unreasonable for the finder of fact to determine Appellant's self-serving testimony in his defense was not credible.

Based on A1C KW's testimony, the strong evidence regarding her level of intoxication, and the various admissions from Appellant, we find the evidence was sufficient, when viewed in the light most favorable to the prosecution, for a reasonable finder of fact to conclude that Appellant engaged in sexual contact with A1C KW when she was incapable of consenting to the sexual acts due to her alcohol impairment, that her condition was known or reasonably should have been known by Appellant, and that he engaged in the contact with the intent to arouse or gratify his sexual desire. Moreover, making allowances for not personally observing the witnesses, we also conclude beyond

a reasonable doubt, based upon our independent review of the record, that Appellant is guilty of the charged offense of abusive sexual contact.

## B. Propensity

Having found the evidence legally and factually sufficient, we now consider whether the military judge's erroneous use of propensity evidence was harmless beyond a reasonable doubt in light of *Hukill*.

### 1. Law

Military Rule of Evidence 413(a) provides that in a court-martial where the accused is charged with a sexual offense, evidence that the accused committed other sexual offenses may be admitted and considered on "any matter to which it is relevant." This includes using evidence of one sexual assault to prove the accused had a propensity to commit another sexual assault. *See United States v. Wright*, 53 M.J. 476, 480 (C.A.A.F. 2000) (citation omitted).

In *United States v. Hills*, 75 M.J. 350, 354 (C.A.A.F. 2016), the CAAF held that evidence of the accused's commission of one sexual assault may not be used to prove propensity to commit another sexual assault if the one sexual assault is charged in the same court-martial as the other and the accused has pleaded not guilty to it.

In *United States v. Hukill*, the CAAF clarified that *Hills* is not to be interpreted narrowly:

> [T]he use of evidence of charged conduct as [Mil. R. Evid.] 413 propensity evidence for other charged conduct in the same case is error, regardless of the forum, the number of victims, or whether the events are connected. Whether considered by members or a military judge, evidence of a charged and contested offense, of which an accused is presumed innocent, cannot be used as propensity evidence in support of a companion charged offense.

76 M.J. 219, 222 (C.A.A.F. 2017). The court reiterated that, where such constitutional error exists, the Government must "prove there was no reasonable possibility that the error contributed to [the] verdict." *Id.* (citations omitted).

In *United States v. Guardado*, the CAAF acknowledged that, even with an error in considering other charged offenses for propensity purposes, "[t]here are circumstances where the evidence is overwhelming, so we can rest assured that an erroneous propensity instruction did not contribute to the verdict." 77 M.J. 90, 94 (C.A.A.F. 2017) (citation omitted). In *Guardado*, the evidence consisted solely of the testimony of his accusers. *Id.* The CAAF did not disturb the service court's finding that the victim's testimony was credible yet

found "the lack of supporting evidence ma[de] it difficult to be certain that [Guardado] was convicted . . . on the strength of the evidence alone." *Id.*

In contrast, our superior court has found no prejudice for a *Hills* error and summarily affirmed convictions where evidence included independent eye-witness testimony and incriminating admissions by an appellant. *See United States v. Hazelbower,* 78 M.J. 12 (C.A.A.F. 2018) (mem.) (military judge's erroneous use of charged misconduct for propensity purposes was harmless beyond a reasonable doubt where "victims' accounts were corroborated by a wealth of independent supporting evidence," including admissions and incriminating texts)*; United States v. Williams,* 77 M.J. 459, 464 (C.A.A.F. 2018) (one conviction survived the improper use of propensity evidence because it was supported by independent evidence corroborating the circumstances surrounding the sexual offense, although there was no direct corroboration of the sexual act itself); *United States v. Moore*, 77 M.J. 198 (C.A.A.F. 2018) (mem.) (evidence of the appellant's guilt was overwhelming given the strength of the Government's case, which included compelling victim and eyewitness testimony); *United States v. Luna*, 77 M.J. 198 (C.A.A.F. 2018) (mem.) (military judge's erroneous propensity instruction was harmless beyond a reasonable doubt where the victim's testimony was corroborated by witness testimony and incriminating text messages written by the appellant).

### 2. Facts

In this case, there was no mention of Mil. R. Evid. 413 until after the presentation of evidence by both sides. In an off-the-record Rule for Courts-Martial (R.C.M.) 802 session, the military judge discussed instructions. The military judge summarized that discussion as follows:

> We had an 802 this morning to discuss instructions in this case. And although this is not a member's case, I wanted to go through with counsel the instructions they thought would be applicable if I were instructing members, so that I might consider them during my deliberations. We specifically discussed whether there were any defenses raised by the evidence, and defense requested that I consider the defenses of consent and mistake of fact as to consent, which I intend to do. . . . The government asked me to consider 413, which I will do . . . .

Neither party added to or corrected the summary of the R.C.M. 802 session or made any additional statements regarding instructions.

### 3. Analysis

In Appellant's case, the military judge's use of propensity evidence under Mil. R. Evid. 413 created a constitutional error, but the error was harmless beyond a reasonable doubt. The Government's case was strong, independent

of any inference of propensity. While it is true the Government referred to propensity in its closing argument, it did not rely on propensity in the presentation of its case.

Appellant was convicted of sexual offenses where the victim's testimony was aided by other witnesses' testimony, Appellant's admissions before trial, his conflicting testimony at trial, or some combination of the three.[6] It is true that the evidence involving A1C KW is stronger than that involving SrA LS based only on their recollections of what happened with Appellant. However, the Government's case as to both allegations was strong, did not rely solely on the victims' testimony, and included evidence provided by other witnesses and Appellant.

This is not a case of an alleged victim's testimony, standing alone, bolstered by improper consideration of Mil. R. Evid. 413 propensity evidence. Instead, the record in this case contains extensive, credible, corroborating evidence of the events involving both SrA LS and A1C KW. Further, Appellant's own admissions to both SrA LS and A1C KW, his statements to third parties concerning specific factual aspects of the separate incidents, and the personal observations and testimony of other witnesses make Appellant's in-court denials suspect. Most significantly, Appellant's trial testimony that he lied when he admitted to SrA LS that they had sexual intercourse on the night in question is not credible, as he only chose to reveal that explanation when it served a much more personal objective of avoiding a conviction.

Considering the overwhelming strength of the Government's case, much like in *Hazelbower* and *Williams*, and the weak defense case, we find the military judge's error of considering propensity evidence under Mil. R. Evid. 413 did not contribute to the verdict. We are convinced the use of charged conduct as propensity evidence for other charged conduct by the military judge was harmless beyond a reasonable doubt.

**C. Post-Trial Delay**

Appellant asserts that the unreasonable post-trial delay from the date the case was first docketed with this court in March 2015 until the date of this opinion warrants relief. Appellant's alleged prejudice is premised on a favor-

---

[6] The military judge found Appellant not guilty of the abusive sexual contact offense involving SrA LS, the only offense that Appellant consistently denied. We are mindful of the language in *Guardado* that any harm that resulted from allowing propensity evidence from one specification is not necessarily extinguished by an acquittal of that same specification. 77 M.J. at 94.

able decision based on the application of *Hukill*, and his requested remedy is that his convictions be set aside.

### 1. Law

We review de novo whether an appellant has been denied the right to due process and a speedy post-trial review and appeal. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed before the court. *Id.* at 142. The *Moreno* standards continue to apply as a case remains in the appellate process. *United States v. Mackie*, 72 M.J. 135, 135–36 (C.A.A.F. 2013) (per curiam). The *Moreno* standard is not violated when each period of time used for the resolution of legal issues between this court and our superior court is within the 18-month standard. *Id.* at 136 (citing *United States v. Roach*, 69 M.J. 17, 22 (C.A.A.F. 2010)). When an appellate decision is not completed within 18 months, such a delay is presumptively unreasonable and triggers an analysis of the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted).

### 2. Facts

We issued *Phillips I* on 7 September 2016, within 18 months from when Appellant's case was originally docketed with the court. On 24 October 2016, Appellant filed a petition for review at the CAAF and did not raise post-trial delay. On 3 January 2017, the CAAF granted the petition. On 7 February 2017, Appellant filed his final brief at the CAAF, again raising no post-trial delay issue. On 27 July 2017, the CAAF set aside our decision (*Phillips II*) and remanded the case for a new Article 66, UCMJ, review. The case was re-docketed with this court on 31 July 2017.

Appellant filed his remand brief on 15 September 2017, requesting "expedited consideration of his case," but did not raise a post-trial delay issue. On 21 December 2017, Appellant filed a Motion to Cite Supplemental Authorities and asserted his right to timely appellate review. Appellant argued that 1,018 days had passed between the filing of the motion and the date his case was originally docketed with this court.[7] On 6 February 2018, we issued *Phillips III* setting aside the action of the convening authority and remanding the

---

[7] Only 143 days had passed since the case was re-docketed with the court after remand by the CAAF.

case to remedy an error in post-trial processing. We issued our decision 190 days after docketing.

On 7 February 2018, Appellant filed another petition for grant of review with the CAAF, making no mention of post-trial delay. The Government moved to dismiss this petition as unripe because this court's Article 66, UCMJ, review was not complete. On 5 March 2018, the CAAF granted the motion to dismiss without prejudice.

On 7 March 2018, the Government moved this court to reconsider its 6 February 2018 opinion. Appellant opposed the motion and the court denied the motion for reconsideration on 3 April 2018.

On 7 June 2018, the Military Justice Division of the Air Force Legal Operations Agency (AFLOA/JAJM) notified the General Court-Martial Convening Authority (GCMCA) of this court's remand (*Phillips III*). On 13 June 2018, a new staff judge advocate's recommendation was sent to Appellant's trial defense counsel. On 22 June 2018, Appellant submitted clemency matters, asserting a *Moreno* delay based on the original 2015 date of docketing. The GCMCA took action on 17 July 2018. The court-martial order (CMO) was distributed on 27 July 2018. Between 21 August and 28 August 2018, AFLOA/JAJM and the GCMCA's legal office discussed the language of the action and corresponding CMO and ultimately determined that, while the language was technically correct, a new action and CMO should be prepared "for administrative clarity." The new action and CMO were signed on 28 August 2018, 82 days after the remand by this court. On 4 September 2018, the new CMO was mailed to AFLOA/JAJM.

Appellant's case was again re-docketed with this court on 9 September 2018. Appellant filed an out-of-time brief on 12 October 2018.

### 3. Analysis

This court issued *Phillips I* and *III* within 18 months of the respective docketing dates, and consequently there is no presumption of facially unreasonable delay. *See Moreno*, 63 M.J. at 142. This opinion is issued less than six months from docketing Appellant's case after our remand for new post-trial processing, and consequently there is also no presumption of facially unreasonable delay. *See id.* Without a presumptively unreasonable delay, we need not conduct a *Barker* analysis. *See Mackie*, 72 M.J. at 136 (citing *Roach*, 69 M.J. at 22).

Recognizing our authority under Article 66, UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 223–25 (C.A.A.F. 2002). After considering the factors enumerated in *United*

*States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c) (2016). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court